UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
UNITED STATES OF AMERICA,  :
:
    -against-       :  **MEMORANDUM AND ORDER**
:  12-cr-634 (DLI)
TROY D. STEVENS, JR.,  :
:
    Defendant.     :
---------------------------------------------------------------x

**DORA L. IRIZARRY, Chief Judge:**

  On May 28, 2013, Troy D. Stevens, Jr. ("Defendant") pled guilty before a magistrate judge to one count of bank fraud in violation of 18 U.S.C. § 7206(1) (Count Two) and one count of aiding and assisting in the preparation of a false individual tax return in violation of 18 U.S.C. § 7206(2) (Count Six).  *See* Dkt. Entry No. 13.  On August 28, 2013, this Court accepted Defendant's guilty plea.  *See* Order dated Aug. 28, 2013.  Defendant's conviction for Count Two, which is the subject of this Memorandum and Order, related to a $4.6 million loan he obtained fraudulently on behalf of Kinpit Associates, L.P. ("Kinpit"), a limited partnership in which Defendant was a general partner that owned and operated buildings in New York City.  Defendant obtained the loan from North Fork Bank, which later was acquired by Capital One Bank NA ("Capital One," and the "Capital One Loan"), pursuant to a fake partnership agreement created by Defendant.

  In October 2012, around the time of the issuance of the indictment in this case, Defendant entered into a settlement agreement (the "Settlement Agreement") to resolve a civil suit pending in New York State Supreme Court.  *See Garber v. Stevens*, No. 601917/05 (N.Y. Sup. Ct. 2005).  Pursuant to the Settlement Agreement, Defendant, among other things, conveyed his 50% interest in the partnership to Kinpit.  (*See* Dkt. Entry No. 43, Ex. 10.)  In August 2013, Kinpit sold its buildings for $10.35 million and subsequently paid off the Capital One Loan in full.  (*See* First

Addendum to Presentence Investigation Report at 5, Dkt. Entry No. 19.) Prior to Defendant's sentencing, this Court entertained extensive discussions regarding the appropriateness of restitution for Defendant's conviction of Count Two, including oral argument during two separate conferences (*see* Dec. 2, 2013 Sentencing Tr., Dkt. Entry No. 32; Feb. 28, 2014 Sentencing Tr, Dkt. Entry No. 39), and several written submissions (*see* Dkt. Entry Nos. 19, 22, 25, 26, 28, 29, 33, 34). The Court ultimately ordered Defendant to pay restitution to Kinpit in the amount of $4,486,176.05 for Defendant's conviction of Count Two.[1]

After Defendant appealed both his sentence and the order of restitution, on October 25, 2016, the Second Circuit Court of Appeals affirmed his sentence, but remanded the case to this Court to clarify whether this Court applied the prevailing principles governing restitution, including those set forth in *United States v. Thompson*, 792 F.3d 273 (2d Cir. 2015). *United States v. Stevens*, 657 F. App'x 69, 73 (2d Cir. 2016). Specifically, the circuit court panel certified seven questions for this Court to address on remand. *Stevens*, 657 F. App'x at 73.

Following the issuance of the mandate from the circuit court (*See* "Mandate," Dkt. Entry No. 41 at 7-8, dated Dec. 6, 2016), this Court ordered additional briefing as to the appropriateness of restitution, and for the parties' respective positions regarding the questions posed by the Court of Appeals. When it became evident that the government had changed its position in light of the Mandate and no longer would seek restitution, the Court permitted Kinpit, as an interested party, to file a submission defending the Court's prior restitution order.

After considering the submissions from the government, Defendant, Kinpit and the Probation Department (the "Interested Parties") (Dkt. Entry Nos. 43, 45, 46, 49, 50, 53, 54, 57, 58,

---

[1] The Court also sentenced Defendant to 63 months of imprisonment and three years of supervised release for Count Two, and 12 months of imprisonment and one year of supervised release for Count Six, both sentences to run concurrently with each other.

59, 60 (collectively, the "Post-Mandate Submissions")), the Court held a hearing on May 25, 2017 (the "May 25 Hearing"), at which it issued an oral decision finding that its prior order of restitution shall remain in place until further direction from the circuit court panel (May 25, 2017 Tr.). During the hearing, the Court explained its findings as to each of the seven questions posed in the Mandate. (*See generally Id.*) The Court also noted that in order to rectify the "lack of clarity in the record" as to restitution, *Stevens*, 657 F. App'x at 73, the Court also would issue a written order "clearly laying out the answers" to the seven questions posed in the Mandate (May 25, 2017 Tr. at 35). This is that order.

## DISCUSSION

**1. Was the District Court treating Kinpit as a victim of Steven's bank fraud for purposes of the [Mandatory Victims Restitution Act ("MVRA")], or as a third party compensator?**

The Interested Parties all maintain that, at sentencing, the Court treated Kinpit as a third party compensator for purposes of the MVRA (*see* Feb. 28, 2014 Sentencing Tr. at 74-80; *see* Post-Mandate Submissions), and the Court agrees. As the Court noted during sentencing, the $4,486,176.05 restitution award represented the amount Kinpit "repaid the bank" for what it was owed as a result of the fraudulent conduct set forth in Count Two. (Feb. 28, 2014 Tr. at 76.) The Court further noted at sentencing that, although Kinpit suffered additional losses as a result of Defendant's conduct, "the partners cannot be made completely whole for all of this loss because it must be related to the loss of conviction and since they do stand in the shoes of the bank, they can only get that $4.4 plus million in restitution." (*Id.* at 76-77.)

Kinpit advances an alternative theory that, in addition to being treated as a third party compensator, it also should be treated as a victim of the offense in Count Two because "Kinpit was injured by Defendant's criminal conduct 'in the course of the scheme,' and thus qualifies as a victim for purposes of the MVRA." (Dkt. Entry No. 49 at 10.) The Court finds this statement

3

drastically overstates Kinpit's connection to the Count Two offenses. While it is true Kinpit suffered additional losses as a result of Defendant's overall course of conduct (including conduct other than that charged in Count Two), the count of conviction at issue here is a fraud perpetrated upon a federally-insured financial institution, from which Kinpit cannot be said to have suffered direct and proximate harm. *See* 18 U.S.C. §3663A(a)(2). It is only Kinpit's decision to compensate Capital One for the losses associated with the fraudulently obtained Capital One Loan that allows Kinpit to collect as a third party compensator standing in the shoes of Capital One.

Therefore, the Court agrees with the Interested Parties that, at sentencing, the Court treated Kinpit as a third party compensator for purposes of the MVRA, and not as a victim.

**2. What were Capital One's "actual losses"?**

The government calculates that Capital One's actual loss attributed to Count Two is $4,500,592.71. (Dkt Entry No. 43 at 4.) The government further notes that Capital One's loss attributed to Count Three, which is not an offense of conviction, is $544,508.43. Kinpit and Probation agree with the government's computation as to the actual losses attributed to Count Two (*see* Dkt. Entry Nos. 49 at 21; 57 at 1), as does the Court.

Defendant does not take issue directly with the government's calculation, but rather contends, citing to no authority, that Capital One's actual losses were zero because "the Capital One loans were fully secured throughout the life of the various loans by the collateral held by the bank." (Dkt. Entry No. 45 at 1-2.) The Court disagrees. As the government and Kinpit note, Capital One probably would not have prevailed in a foreclosure proceeding because the mortgage and loans at issue were procured by Defendant's fraud. (Dkt. Entry No. 46 at 2 (citing *GMAC Mortgage v. Chan*, 56 A.D.3d 521, 522 (2d Dep't 2008) ("A deed based on a forgery or obtained by false pretenses is void ab initio and a mortgage based on such a deed is likewise invalid . . . ."); Dkt. Entry No. 49 at 24 (same).) Given this likelihood, Defendant's contention that Capital One's

interest in the loan at issue in Count Two was secured fully, and, thus Capital One did not suffer any losses, simply is incorrect.

Therefore, Capital One's actual loss attributed to Count Two is $4,500,592.71.

**3. Did the Restitution Award include compensation for Kinpit's losses (as opposed to Capital One's losses)?**

All Interested Parties agree the restitution award did not include compensation for Kinpit's losses. (*See* Post-Mandate Submissions.) The award of $4,486,176.05 included only compensation for Capital One Bank's losses. (*Id.*)

As noted in the Court's response to Question One, p. 3, *supra*, the Court noted at sentencing that, while Kinpit suffered additional losses stemming from Defendant's conduct, Kinpit could not receive restitution for losses suffered by the partnership itself that were not a direct and proximate result of an offense of conviction, but only could receive restitution for those losses suffered by Capital One that later were reimbursed by Kinpit. (Feb. 28, 2014 Tr. at 74-77.) Accordingly, the Court agrees with all Interested Parties that the restitution award did not include compensation for Kinpit's losses.

**4. Did the restitution award exceed the amount of Capital One's actual losses resulting from Steven's bank fraud?**

In accord with the Court's conclusion as to Questions Two (*See* Discussion, Question Two, p. 4, *supra*), the Court finds that the restitution award did not exceed the amount of Capital One's actual losses resulting from Defendant's bank fraud. The government, Kinpit, and Probation all agree on this point because they agree that Capital One's actual losses totaled $4,500,592.71, while the restitution award was $4,486,176.05. (Dkt. Entry No. 43 at 4; Dkt Entry Nos. 49 at 26; Dkt. Entry No. 57 at 2.)

Defendant disagrees with this conclusion because, as discussed above in connection with Question Two, Defendant maintains that Capital One did not incur any actual losses. (Dkt Entry No. 45 at 2.) For the reasons already discussed there, the Court disagrees with this argument. (*See* Discussion, Question Two, p. 4, *supra*.)

**5. Were any of the loan proceeds diverted by Stevens, and if so, how much went to Kinpit?**

All Interested Parties, including Defendant, agree that at least some of the loan proceeds were diverted by Stevens. (*See generally* Post-Mandate Submissions.) However, the parties do not agree on how much of the money was diverted, or how much, if anything, went to Kinpit. (*Id.*) In this Court's view, an important resource in resolving this question is the August 2011 decision of the New York State Supreme Court awarding summary judgment to Kinpit on its claims for breach of contract, breach of fiduciary duty and violation of Article 12, § 440 of the Real Property Law. *See Garber v. Stevens*, No. 601917/2005, NYSCEF Doc. No. 170 (N.Y. Sup. Ct. Aug. 10, 2011). In that decision, the court found that Defendant and a partnership entity owned by him had breached their fiduciary duty by hiring Defendant's wholly-owned subsidiary, Dawmich Industries, Inc. ("Dawmich"), to perform all the repairs and maintenance on the property, through which Dawmich earned nearly $5 million. *Id.* at 8-9. The state court further found that Defendant and the partnership entity "caused the partnership to incur more than $400,000 in expenses in connection with the unauthorized refinancings . . . and that Stevens reimbursed himself for more than $1.4 million in undocumented and unsubstantiated loans." *Id.* at 9. The court ruled that "Stevens has failed to come forward with any admissible evidence raising a question of fact regarding the breach of contract and breach of fiduciary claims." *Id.*

As this Court explained at sentencing, at no time has Defendant presented any compelling evidence to show that any of the money diverted from the partnership operating account to Dawmich actually was used to make repairs to the buildings owned by Kinpit. (Feb. 28, 2014 Tr.

at 77-79.) As such, although some confusion arises due to the fact that the fraudulently obtained money was comingled in the partnership operating account with purportedly legitimate money from, among other things, rents and federal subsidies, the Court finds nothing in the Post-Mandate Submissions to substantiate Defendant's claim that any money from the Capital One Loan was used for a legitimate partnership purpose. (*See* Defendant's Post-Mandate Submissions, Dkt. Entry Nos. 45, 54, 59.) As the government demonstrated convincingly prior to sentencing, because there were sufficient funds from the rental payments and federal subsidies to maintain the properties and pay for repairs, "[t]here was simply no legitimate business purpose, related to the maintenance of the buildings or otherwise, for the defendant, between 2000 and 2005, on six separate occasions, to have the Kinpit Partnership borrow $5.2 million." (Dkt. Entry No. 28.) As such, any loan money diverted was for Defendant's personal benefit.

In sum, the Court finds that all transfers of the loan proceeds made by Defendant from the partnership operating account were for his personal benefit and that none of the loan proceeds were diverted to Kinpit.

**6. Is Kinpit receiving a windfall (*i.e.*, is Stevens being ordered to pay monies to Kinpit he has already paid)?**

In its first Post-Mandate Submission, the government took the position that Kinpit would not be receiving a windfall under the Court's restitution order because, as an overall matter, the restitution amount is less than the $11,714,073 in total losses Kinpit suffered as a result of Defendant's fraudulent conduct. (Dkt. Entry No. 43 at 6-7; *see* Dkt. Entry No. 53 at 6-7.) However, this does not answer Question Six because it takes into account conduct other than that of the offense of conviction. In subsequent submissions, the government clarified that its position as to Question Six actually was that the restitution order in fact did require Defendant to pay to Kinpit monies he already had paid. (Dkt. Entry No. 53 at 6-7.) The government indicated that it

interpreted the Mandate to suggest that Defendant was entitled to receive a set off pursuant to 18 U.S.C. § 3663A(b)(1) for surrendering his interest in the Kinpit Buildings. (Dkt. Entry No. 53 at 3, 7.) The government found Defendant's act of surrendering his economic and partnership interests in Kinpit particularly important in qualifying for a set off because it "facilitated and allowed for a more immediate sale of Kinpit's buildings and the repayment of the loans that followed." (Dkt. Entry No. 58 at 2.)

The Court disagrees with the government and Defendant that Defendant's partnership interest must be allocated on a first priority basis towards compensating Kinpit for paying off the Capital One Loan. As an initial matter, and important in answering Question Seven, *infra*, the Settlement Agreement does not expressly state or require that the Defendant's relinquishment of his partnership interest be used to pay off the Capital One Loan (*see* Dkt. Entry No. 43 at Ex. 10). Indeed, the Settlement Agreement lists the foreclosure proceeding Capital One initiated in order to collect on the Capital One Loan as a suit "against or affecting the Partnership which, if adversely determined, would have an effect on the business, operations, properties, assets, or condition, financial or otherwise, of the Partnership." (*Id.* at 4.) The Settlement Agreement also provides that Defendant would: (i) indemnify Kinpit against any liabilities "incurred or to be incurred by the Partnership by reason by any . . . claim, suit or investigation;" (*Id.* at 8); and (ii) indemnify Kinpit against causes of action asserted in a lawsuit brought by HSBC Bank USA, National Association ("HSBC") (*Id.* at 8-9). Importantly, although the parties were obviously aware of the Capital One foreclosure proceeding as it is expressly mentioned in the document, the Settlement Agreement does not indicate who would bear the responsibility for paying any liabilities owed in connection with that proceeding, as they did with the HSBC matter. As a result, because Kinpit

was not required to pay the Capital One Loan under the terms of the Settlement Agreement, the Court finds that Defendant cannot be said to have paid for that loan already.

The Court concludes that restitution remains appropriate in this case. "Because the MVRA *requires* the district court to order full compensation, a private settlement consummated before sentencing can neither waive a defendant's restitution obligation nor cabin the value of restitution to whatever sum the parties negotiate in advance." *United States v. Baudanza*, 2014 WL 795639, *3 (E.D.N.Y. Feb. 27, 2014) (emphasis in original) (citing *United States v. Gallant*, 537 F.3d 1202, 1250 (10th Cir. 2008) ("The MVRA requires the sentencing court to provide restitution to victims . . . . A private settlement cannot abrogate that language.")); *United States v. Hamburger*, 414 F. Supp.2d. 219, 224 (E.D.N.Y 2006) ("This Court is constrained to follow the cited appellate authority that a pre-existing civil settlement does not limit a court's obligation to order restitution in accordance with 18 U.S.C. § 3663A."). Although a settlement may be considered "as an offset against the calculation of total loss to the victim," *Hamburger*, 214 F. Supp.2d. at 224, under the prevailing case law, such an offset appears to be appropriate only where the defendant makes the payment to the victim directly.

For this reason, the government's focus on *United States v. Thompson*, 792 F.3d 273 (2d Cir. 2015) is misplaced. The government attempts to read the tea leaves in the Mandate in arguing that the panel's citation to *Thompson* suggests the circuit court believes an set off is appropriate here. The Court believes the government reads too much into the panel's reference to *Thompson*.[2] In *Thompson*, the defendant voluntarily repaid his victims for a portion of their loss after his fraud was discovered. *Id.* at 275. Pursuant to the district court's initial restitution order, defendant was ordered to pay the full amount of his fraud, $65,143.47, and was not given credit for the $30,400

---

[2] The panel instead appears to have cited *Thompson* merely for purposes of stating the prevailing standard for restitution under the MVRA.

he already had repaid to his victims. *Id.* 280. The Second Circuit reversed, finding that the defendant's legal liability under the MVRA was the "total value of the stolen property ($65,143.47) minus the value of what he returned to the victims ($30,400), equaling $34,743.47." *Id.*

By contrast, here. Defendant paid the victim, Capital One, nothing. It is of no import that Kinpit voluntarily decided to resolve the Capital One Loan, which was done in order to prevent potentially significant litigation expenses. As the Settlement Agreement did not expressly require Kinpit to convert Defendant's partnership interest into a payment to compensate the victim of Count Two, the payment of the Capital One Loan cannot be said to have been made by Defendant. Moreover, *Thompson* directly supports this Court's original restitution order in that *Thompson* reiterated that whatever is paid to a victim by third party compensators (in this case, what Kinpit paid to Capital One) cannot change a defendant's legal liability:

> The fact that Wells Fargo and Citibank, as third-party providers of compensation, have already paid the [victims] a cumulative $43,284.47—$8,541 more than what Thompson himself can be asked to pay—does not affect Thompsons's legal liability under the MVRA. The sole effect of that compensation is to direct payment of Thompson's remaining obligation, since the [victims] have been fully compensated by the banks and Thompsons's repayments, from the [victims] to the banks themselves.

*Id.* at 280. Under this rationale, Kinpit's payment to Capital One does not change Defendant's restitution liability. Because the Court finds that Defendant's relinquishment of his partnership interest was not made in order to compensate Capital One, his restitution liability remains outstanding.

In sum, the Court finds that Kinpit is not receiving a windfall, *i.e.*, Stevens is not being ordered to pay monies to Kinpit he has already paid.

**7. Was the settlement agreement between Stevens and Kinpit intended to compensate Kinpit for its losses resulting from Stevens's bank fraud, and if so, to what extent?**

For the reasons discussed in response to Question Six, p.8, *supra*, the Court finds the settlement agreement between Stevens and Kinpit was not intended to compensate Kinpit for its losses resulting from Steven's bank fraud.

\* \* \*

Finally, at the end of the May 25 Hearing, Kinpit requested that it be permitted to join this criminal action as an "intervenor" for purposes of defending the Court's restitution order. As noted above, this Court previously permitted Kinpit to file a submission defending the Court's prior restitution order in light of the fact that the government abandoned its prior position that restitution to Kinpit was appropriate. As "[n]o rule of federal criminal procedure allows intervention by third parties in a criminal proceeding," *In re N.Y. Times Co.*, 878 F.2d 67, 67 (2d Cir. 1989), and Kinpit offered no authority that would support the Court's decision to confer such status here, Kinpit's application is denied. Should Kinpit desire to be heard on any appeal of this Order, it should direct any such request to the Second Circuit panel in which full jurisdiction will be restored after either party notifies the circuit court of this decision. *See Stevens*, 657 F. App'x at 73. The Court notes, however, that, as it recognized during the May 25 Hearing, it found Kinpit's input valuable to the Court in assessing the merits of the parties' submissions following the Mandate.

## CONCLUSION

For the reasons set forth above and during the May 25 Hearing, this Court finds its prior order of restitution shall remain in place. Accordingly, Defendant is ordered to pay restitution in the amount of $4,486,176.05 to Kinpit for his conviction under Count Two.

SO ORDERED.

Dated: Brooklyn, New York
       August 21, 2017

                                                    /s/
                                       DORA L. IRIZARRY
                                          Chief Judge